UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TEL-TOWNE PROPERTIES GROUP,

    Plaintiff,

vs                                                                           Case No: 01-72571
                                                                   Honorable Victoria A. Roberts

TOYS "R" US-DELAWARE, INC.,

    Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. #70). For the reasons stated below, Plaintiff's motion is **GRANTED IN PART** and **DENIED IN PART**.

**II.    BACKGROUND**

This action arises from Plaintiff Tel-Towne Properties Group ("Tel-Towne") and Defendant Toys "R" Us - Delaware, Inc.'s ("TRU") conflicting interpretations of the parties' lease agreement. TRU runs a retail business on property owned by Tel-Towne, pursuant to a lease executed on September 25, 1970. Tel-Towne's predecessor-in-interest, Goodrich Investors Group ("GIT"), was the initial lessor.[1] The initial lessee was

---

[1]GIT was not Tel-Towne's immediate predecessor. At some point between 1970 and 1976, GIT was succeeded by GIT Industries, Inc. Def. Exh. W at ¶3. In 1976, GIT Industries sold the property and lease to First Properties Associates ("First Properties"). *Id.* First Properties then assigned its interest in the property and lease to Tel-Towne.

1

Tamaron Realty, a wholly-owned subsidiary of Interstate Department Stores ("Interstate"). In the late 1970's, Interstate changed its name to TRU.

The initial term of the lease was 31 years, giving TRU four five-year options to renew. However, TRU is required to give notice of its intent to renew six months prior to the expiration of the preceding term. The parties disagree on the date the initial term of the lease expired and, consequently, whether TRU timely exercised the first option.

Section 2.01 of the lease reads:

> The initial term of this Lease shall commence upon the date hereof, and shall terminate on the 31st day of January after the completion of the thirty-first (31st) full "lease year", as said term is hereinafter defined.

Pl. Exh. A. The term "lease year" is defined in Section 35B:

> The term "lease year" as used herein shall mean any twelve month period during the term of this Lease commencing upon a February 1st, except, however, (a) the first lease year shall commence upon the date hereof and end on January 31, 1971.

*Id.*

The lease was signed on September 25, 1970. TRU gave notice of its intent to renew in May 2001. However, Tel-Towne calculates the expiration date of the initial lease term, per Sections 2.01 and 35B, to be January 31, 2001. That is, Tel-Towne calculates the 31-year term to include one abbreviated "year"--from September 1970 to January 1971--plus 30 calendar years. Therefore, Tel-Towne asserts that TRU's attempt to exercise the renewal option was untimely.

TRU, however, offers two interpretations which it contends shows that the lease

---

*Id.*

expired on January 31, 2002 and, therefore, its renewal notice was timely.  First, because the plain meaning of a "full lease year" is 12 months, TRU argues that first four months of the contract (September 1970 through January 1971) do not count in the calculation of 31 "full" lease years.  TRU contends that the first "full" lease year ran from January 31, 1971 to January 31, 1972.  Therefore, per TRU, 31 years ended on January 31, 2002.  Alternatively, even if Tel-Towne's interpretation is correct, TRU argues that Section 2.01 states that the lease "shall terminate on the 31st day of January <u>after</u> the completion of the thirty-first (31st) full 'lease year.'"  Pl. Exh. A (emphasis added).  TRU asserts that this means that the contract extends one calendar year *after* the 31st calendar year to January 21, 2002.

    This matter was previously before the Court on Tel-Towne's motion for judgment on the pleadings.  The Court denied Tel-Towne's motion and *sua sponte* entered a judgment in favor of TRU.  *See* Opinion & Order Denying Plaintiff's Motion for Judgment on the Pleadings*,* January 23, 2002.  The Court found that the lease unambiguously provided for a January 31, 2002 expiration date.  The Court denied Tel-Towne's subsequent motion for reconsideration, which was based on extrinsic evidence Tel-Towne claimed supported its interpretation, and Tel-Towne's motion to amend the complaint to add a count to reform the contract so that it is consistent with the intent of the drafters.  *See* Order Denying Motion for Reconsideration and Denying Motion to Amend Complaint, July 29, 2002.

    Tel-Towne appealed.  The Sixth Circuit reversed.  The Sixth Circuit held that this Court erred in failing to consider whether Tel-Towne's extrinsic evidence (to the extent the Court finds it admissible) reveals an ambiguity regarding the expiration date.  *See*

*Tel-Towne Properties Group v Toys "R" US,* 123 Fed. Appx. 656 (6th Cir. 2005). The Sixth Circuit also vacated the Court's denial of Plaintiff's motion to amend its complaint. The Sixth Circuit held that, under the liberal amendment standards, Tel-Towne should be allowed to have its reformation claim considered on the merits, or this Court must provide a basis for refusing to permit the amendment.

On remand, Tel-Towne was permitted to amend its complaint. In the Amended Complaint, Tel-Towne requests either a declaratory judgment that its interpretation of the lease is correct, or that it be allowed to reform the lease to conform to what Tel-Towne believes was the intent of the drafters. *See* Plaintiff's First Amended Complaint. The parties engaged in discovery, which Tel-Towne says revealed additional evidence that its interpretation is the one intended by the drafters.

In May 2006, Tel-Towne filed a second action against TRU in state court. It was removed to this Court. *See Tel-Towne v Toys "R" US,* Case No. 06-12255. In the second complaint, Tel-Towne seeks to terminate TRU's tenancy and money damages based on its claims of: 1) unjust enrichment as tenants-at-sufferance of the original leased premises; 2) unjust enrichment by wrongful occupancy of the "mezzanine" as tenants-at-sufferance since February 1, 2001; 3) "lost opportunity" damages for TRU's wrongful occupation after February 1, 2001; 4) breach of lease--percentage rent; 5) fraudulent misrepresentation with respect to percentage rent; 6) breach of lease and unjust enrichment for failure to pay mezzanine rent during original lease term; and 7) breach of lease and common law duty to keep premises in good repair. Tel-Towne is holding its damages claims in abeyance pending a ruling on the interpretation of the lease.

Tel-Towne now requests summary judgment on its request for declaratory relief. Tel-Towne asks the Court to find that: 1) the initial term of the lease expired on January 31, 2001; 2) TRU failed to timely exercise its right to renew the lease; and 3) Tel-Towne is entitled to possession of its property free and clear of any interest of TRU. If the Court grants its motion, Tel-Towne asks that the case proceed to discovery and trial on the issue of money damages owed by TRU.

## III. STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing

5

out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV. ARGUMENTS AND ANALYSIS

### A. Defendant Failed to Timely Exercise its Lease Renewal Option

"In deciding a case involving a contract dispute, the primary role of a court is to ascertain the intent of the parties." *Henry v J.B. Publishing Co.,* 54 Mich. App. 409, 412 (1974). "To do so, [a court] reads the agreement as a whole and attempts to apply the plain language of the contract itself." *Old Kent Bank v Sobczak*, 243 Mich. App. 57, 63 (2000).

"An unambiguous contract must be enforced according to its terms." *Reed v Reed*, 265 Mich. App. 131, 141 (2005). If, however, the contract language is

6

ambiguous, the court may consider extrinsic evidence to ascertain the parties' intent or to determine whether there is a latent ambiguity. *Glenwood Shopping Center Limited Partnership v K Mart Corporation*, 136 Mich. App. 90, 99 (1984); *Henry*, 54 Mich. App. at 413; *Wonderland Shopping Center Venture Limited Partnership v CDC Mortgage Capital, Inc.*, 274 F.3d 1085, 1095 (6th Cir. 2001). "A contract term is ambiguous if it is reasonably susceptible to more than one meaning." *Wonderland*, 274 F.3d at 1095.

A party may only rely upon extrinsic evidence which is consistent with the terms of the written contract; evidence which varies or contradicts the contract terms is not admissible. *Id*; *Glenwood*, 136 Mich. App. at 99. "[I]f a latent ambiguity is proven to exist, extrinsic evidence may then be used as an aid in the construction of the contract." *City of Grosse Pointe Park v Michigan Municipal Liability and Property Pool*, 473 Mich. 188, 201 (2005). "[W]hether contract language is ambiguous is a question of law." *Port Huron Education Association, MEA/NEA v Port Huron Area School District*, 452 Mich. 309, 323 (1996).

On appeal, the Sixth Circuit found that there is a basis to find that the language at issue is ambiguous on its face, contrary to this Court's finding. However, the Sixth Circuit did not (explicitly) reverse the Court's ruling on this issue. Rather, it directed the Court to determine whether admissible extrinsic evidence offered by Plaintiff reveals a latent ambiguity.

The Court finds that Plaintiff demonstrated that there is an ambiguity in the language at issue, and that the ambiguity must be resolved in Plaintiff's favor. "A latent ambiguity exists where the language and its meaning is clear, but some extrinsic fact creates the possibility of more than one meaning." *In re Woodworth Trust*, 196 Mich.

App. 326, 328 (1992). Plaintiff presents testimony and/or affidavits from several individuals involved in the negotiation and drafting of the lease agreement. *See Ford Motor Company v Northbrook Insurance Company*, 838 F.2d 829, 833 (6th Cir. 1988)(testimony of co-author of a contract admissible to show the intent of the parties). Their testimony regarding why the terms at issue were drafted as they were and the parties' understanding of those terms exposes the ambiguity in the language at issue and supports Plaintiff's claim that the parties intended for the contract to expire on January 31, 2001.

Robert Peduzzi is an attorney who participated in the negotiation and preparation of the lease on behalf of Plaintiff's predecessor, GIT. Peduzzi stated that he worked on multiple transactions between GIT and Interstate and it was customary for them to enter leases for a period of 30 years plus an abbreviated "stub" period. Def. Exhs. F-1 at pp. 21-22; F-2 at ¶¶15, 16, 18a. Peduzzi said he did not recall "ever drafting a lease with Interstate which called for a term of thirty-one (31) full twelve (12) month lease years." Def. Exh. F-2 at ¶16. The parties' rationale in including the stub period in the September 1970 lease, per Peduzzi, was "to allow Tamaron [the original tenant] . . . to occupy the premises during the 1970 Christmas season," Def. Exh. F-2 at ¶18(c), and to simplify the accounting:

> [W]e said okay, we'll make it a term of art and we'll call the stub period the first full leased year and nobody can be confused by this because we will say even though it's only four months, we are calling it -- for the purposes of the lease -- the first full lease year. And, then on February 1st, for accounting purposes, they can go forward to the next 30 years. They could, for accounting purposes, know that they had 30th [sic] full lease years to go. And we did this on every single lease.

8

Def. Exh. F-1 at p. 23-24.

Donald Levin, an attorney who represented Interstate (the name by which Defendant was formerly known) in connection with its leases, did not recall the lease at issue. However, he testified that the disputed language is similar to language used in other Interstate leases, which was intended to provide for a lease term of 30 years plus a stub period. Def. Exh. H at pp. 18-20. As asserted by Peduzzi, Levin stated that the purpose was to allow the tenant to benefit from the Christmas season. *Id* at 18.

Theodore Malvin, an attorney who represented Interstate, stated that his duties included final preparation of the lease. He worked under the direction of Daniel Reit, who was the Director of Real Estate at Interstate and Tamaron's Vice President. Malvin worked on the lease with Peduzzi and offers the same rationale for inserting the "stub period"-- "to allow the tenant to occupy the premises for an additional Christmas sales season." Def. Exh. I-2 at ¶10. Malvin further stated that he did not recall drafting any lease for a term of 31 years; leases were always in 5-year increments.

Plaintiff also presents several documents it contends shows that the parties understood and intended for the contract to expire on January 31, 2001. The first document is a letter by Reit, who is now deceased. Reit signed the 1970 lease on behalf of Defendant's subsidiary, Tamaron. Five years later in 1975, Defendant terminated Reit's employment (as part of a Chapter 11 reorganization) and he was hired by Plaintiff's predecessor--GIT. In April 1976, when Plaintiff's assignor (First Properties) bought the property from GIT, Reit sent a letter to Plaintiff regarding the Southfield property and lease. Reit attached a document which summarized the property financials and listed the expiration date of the lease as January 31, 2001. Def. Exh. N.

9

The same document was incorporated into the purchase agreement as an attachment. Def. Exhs. O; W at ¶7.

GIT also listed the expiration date as January 31, 2001 in its March 1976 10-K filing with the Securities and Exchange Commission. Def. Exh. P. And, GIT described the contract as a 30-year lease in its Dividend Enclosure and Interim Report, which was issued on September 30, 1970, and in its 1972 financial report. Def. Exhs. M; X.

None of the evidence Defendant offers to support its contrary interpretations of the disputed language refutes the testimony of Peduzzi, Levin and Malvin or otherwise sheds light on the intent of the parties when the lease agreement was executed. First, Defendant presents two lease abstracts which are purported summaries of the lease agreement. They were prepared by Interstate/TRU employees for its internal records. Def. Exhs. U, V. Both abstracts list the lease expiration date as January 31, 2002. Defendant relied upon them to determine when to give its renewal notice. However, the author of the documents is unknown, the first abstract is undated,[2] and the second was prepared in September 1978--eight years after the lease was executed. Malvin, who was involved in the lease preparation and would have been responsible for drafting an abstract for Interstate when the lease agreement was signed, is certain that he did not prepare the first abstract. Based on the evidence presented, the earliest the first abstract could have been prepared was in 1971, when Jefferey Finkel began working

---

[2] Defendant asserts in its brief that the first abstract is dated September 25, 1970, the same date the lease agreement was executed. However, it appears that the date is only included in the title as part of the description of the document summarized. And, Theodore Malvin offers undisputed testimony that it would have been his responsibility to prepare an abstract at that time and he did not prepare the document. Def. Exhs. I-1 at pp. 22-23; I-2 at ¶12.

for Interstate as an Assistant to Reit. Drafting lease abstracts was one of Finkel's responsibilities from 1971 through 1976. Finkel could not remember whether he or an outside temporary employee prepared the first abstract, and he acknowledges that they were sometimes inaccurate. Finkel could not have prepared the second abstract, because he no longer worked for Interstate (then TRU) in 1978.

Notwithstanding the question Plaintiff raises of whether the abstracts are admissible under the Federal Rules of Evidence, neither document provides insight into the intent of the lease drafters. The author of the abstracts and the date the first was prepared is unknown. It appears that neither abstract was prepared contemporaneously with the lease agreement. There is no evidence either was prepared by or at the direction of an individual privy to lease negotiations. And, since the abstracts were prepared solely by Interstate/TRU representatives for internal use, there is no basis for finding that they reflect the *mutual* intent of the parties.

Defendant next cites the testimony of its Vice President-Real Estate Counsel, Michael Tumolo, Finkel, and Michael Miller, an expert witness and former TRU Director of Real Estate (1977-2004), in support of its contention that the lease expired on January 31, 2002. However, Tumolo, Finkel and Miller's testimony does not advance Defendant's claim because none of them was involved in the negotiation or preparation of the lease, nor do they base their opinions on factors independent of the contract language. Tumolo merely offers his interpretation of the contract language. *See* Pl. Exh. 10a. Finkel relies upon his interpretation of the contract language and one of the abstracts. Pl. Exh. 10c at pp. 30-33. And, Miller states that his opinion is based on the contract language and his unspecified "experience." Pl. Exh. 10b at p. 43.

11

Lastly, Defendant asserts that its "course of conduct" is additional evidence in support of its position. Presumably, Defendant is referring to its preparation of the abstracts and reliance upon them. However, as stated, the abstracts are not cognizable evidence of the lease drafters' intent because there is insufficient evidence as to who authored the documents or the basis of the assertion in the abstracts that the lease expired on January 31, 2002.

In sum, there is no evidence upon which reasonable jurors could base a finding contrary to the testimony of Peduzzi, Levin and Malvin that the parties to the lease agreement intended that it would expire on January 31, 2001. Therefore, Defendant's attempt in May 2001 to exercise the first renewal option was untimely.

This finding, however, does not end the Court's analysis because Defendant argues that it is entitled to equitable relief even if the Court finds that Plaintiff's interpretation of the lease is correct. That is, Defendant asks the Court to "exercise its discretionary power to equitably intervene to prevent a forfeiture of TRU's interest in the leased premises." Def. br. at p. 18.

### B. There is a Question of Fact Regarding Whether Defendant is Entitled to Equitable Relief

"'[S]trict compliance' with the terms of an option is the rule in Michigan." *Rapanos v Plumer*, 41 Mich. App. 586, 588 (1972). However, a majority of state jurisdictions which subscribe to the same rule of law allow for equitable relief under special circumstances. *Koch v H & Se Development Co.,* 249 Miss. 590, 622 (1964); *Benetti v Kishner*, 93 Nev. 1, 3 (1977); *Fletcher v Frisbee*, 119 N.H. 555, 558 (1979); *Duncan v G.E.W., Inc.*, 526 A.2d 1358, 1364 (D.C. App. 1987). State courts typically only grant

12

such relief if: 1) the tenant's delay in renewing was slight and/or was the result of an honest mistake or other excusable fault; 2) the delay did not prejudice the landlord; and 3) failure to grant relief would cause a tenant to suffer unconscionable hardship. *See Duncan*, 526 A.2d at 1364; *Fletcher*, 119 N.H. at 558; *Nanuet National Bank v Saramo Holding Co.,* 153 A.D. 2d 927, 928 (N.Y. 1989).

It appears that Michigan has not taken a position on equitable relief in a published opinion. However, in an unpublished opinion, the Michigan Court of Appeals in *Market Development Co. v Village Green*, 2000 W.L. 33407136 (2000), adopted the majority view. In *Market Development*, the tenant (plaintiff) operated a grocery store on the defendant's property pursuant to a lease agreement which had four five-year renewal options. Plaintiff did not submit written notice of the first renewal until six days after the date required by the lease agreement, and only after the landlord brought the failure to timely renew to plaintiff's attention. Plaintiff also filed a declaratory action and requested that the court declare as a matter of law and equity that the renewal option was exercised. Following a bench trial, the court granted plaintiff equitable relief. The trial court found that the delay was a result of ordinary negligence due to an increased workload and shortage of experienced employees. The court also found that there was no evidence of prejudice to the defendant as a result of the delay, but that plaintiff would suffer unconscionable harm because of substantial costly improvements plaintiff made and the infeasibility of relocating the store.

The Michigan Court of Appeals affirmed. Despite Michigan's rule requiring strict compliance with option agreements, the *Market Development* Court noted that "Michigan has long recognized that equity can and should intervene to prevent an

unreasonable forfeiture or harsh result." 2000 W.L. 33407136 at *4. Therefore, the Court held that Michigan precedent supported the trial court's exercise of discretion to equitably intervene.

The *Market Development* Court further discussed the appropriate standard for exercise of discretion. The Court stated that "[w]hether 'special circumstances' exist for purposes of a court of equity granting relief from late renewal, depends on the facts of the case." *Id* at 7. The determination "turns not on a single factor, but on the balance of equities between the parties: the extent to which the lessor has changed position or otherwise been damaged, and the extent to which enforcement of the covenant would be an unconscionable hardship on the lessee." *Id*. In summary, the Court stated that equitable relief may be available to a tenant who fails to timely exercise a renewal option where: 1) the delay has been slight, 2) the delay has not prejudiced the landlord, and 3) the failure to grant relief will result in an unconscionable hardship to the tenant. *Id*. Equitable relief may also be warranted when failure to renew the lease "would result in a substantial forfeiture by the tenant, the landlord would not be prejudiced by the delay in renewal, and the tenant's failure to exercise the option in a timely fashion resulted from an honest mistake or inadvertence, or even negligence of the lessee, at least where the forfeiture would be out of proportion to the lessee's fault." *Id* at 8.

Although unpublished opinions lack precedential authority in Michigan, *see* M.C.R. §7.215(c)(1), *Market Development* is consistent with a majority of state courts and Michigan's principles of equity. Therefore, the Court finds that *Market Development* is an instructive measure of how Michigan courts would decide the question before this Court. The Court also finds that, under the standard set forth in *Market Development*,

Defendant raised a question of fact as to whether equitable intervention is appropriate.

Construing the facts in a light most favorable to Defendant, each of the relevant factors weigh in Defendant's favor. First, there is ample evidence that the delay was due to an honest mistake rather than gross or willful negligence. Plaintiff can hardly deny that there is a basis for finding that the relevant contract language is ambiguous, and that the preparer of the lease abstracts Defendant relied upon simply misconstrued the ambiguity.

Second, there is no evidence Plaintiff suffered prejudice because of the delay. Plaintiff contends that it will suffer substantial prejudice if the contract is not strictly enforced because the lease permits Defendant to pay rent significantly below market value. And, Henry Lee, a majority member of Plaintiff's general partner--HPL Investments, LLC, asserts that he believed that Defendant would not renew its lease because Defendant rebuffed his efforts to renegotiate it prior to the expiration date. However, neither of these factors establishes prejudice.

Prejudice must arise from the delay itself. *Market Development,* 2000 W.L. 33407136 at *13. Here, there is no evidence Defendant ever affirmatively indicated that it would not renew its lease or that Plaintiff relied to its detriment on Defendant's anticipated or actual failure to timely renew. For instance, Plaintiff did not secure another tenant or otherwise encumber the property during the 4 month delay. Also, the fact that there is an alleged disparity between the lease rate the parties negotiated 30 years ago and the current market rate does not establish prejudice because the disparity was not caused by the renewal delay. *See id* at 13 n.8 (citing *Gold Standard Enterprises, Inc. v United Investors Management Co.,* 182 Ill App. 3d 840, 846

15

(1989)("True, the record shows that the rental value of the lease premises has appreciated in today's market. Defendant could charge a higher rent under a new lease. However, the record contains no evidence that the actual delay in receiving the notice, by itself, harmed defendant.")).

Conversely, there is evidence that failing to grant equitable relief would result in a substantial forfeiture and hardship for Defendant. Defendant has operated its business in the same location for over 30 years. In 2006, Defendant generated gross sales in excess of $8 million, and it has generated sales of over $7 million in 2007 (or it is projected to do so). Pl. Exh. Z. And, although Defendant did not present evidence regarding the extent of the repairs and improvements it made over the years, Plaintiff does not dispute that repairs and improvements were made. Pl. Reply at p. 5. Based on this evidence, reasonable jurors could find that Defendant would suffer a loss of goodwill cultivated over 30 years, and the value of its investments in the property.

Plaintiff contends that, in fact, the significant decline in Defendant's gross sales from $11.9 million in 1995 to $7.5 million in 2007 suggests that Defendant enjoys far less goodwill than it represents. Plaintiff also disputes the value and quality of Defendants repairs and improvements. Plaintiff's arguments, however, go to the weight the trier of fact should give Defendant's claimed loss of good will and repairs/improvements in its balance of the relevant factors.

Lastly, there is a question of fact regarding whether Plaintiff's delay in renewing the lease could be regarded as "slight." Plaintiff correctly points out that the four-month delay is significantly longer than the delay in the cases Defendant relies upon. *See Market Development,* 2000 W.L. 33407136 at *2 (6 days); *Nanuet*, 153 A.D. 2d at 928

(6 days); *Fletcher*, 119 N.H. at 557 (7-8 days); *Benetti*, 93 Nev. at 3 (2 months); *Duncan,* 526 A.2d at 1359 (23 days). However, there is no bright line rule regarding what constitutes a "slight" delay, and no single factor is dispositive in the overall analysis. *Market Development*, 2000 W.L. 33407136 at *7. The Court must balance all of the factors and the facts of the case. *Id.* Here, reasonable minds could differ regarding whether four months constitutes a "slight" delay considering the circumstances leading to the delay, the substantial term of the initial lease, the lack of prejudice to Plaintiff, and the potentially significant hardship Defendant would suffer if equitable relief is denied.

For all of these reasons, the Plaintiff's request that the Court declare as a matter of law that it is entitled to possession of its property free and clear of Defendant's interest via the lease is denied.

## V. CONCLUSION

Plaintiff's motion is **GRANTED** with respect to Plaintiff's claim that the lease expired on January 31, 2001, and that Defendant's renewal notice was untimely. However, Plaintiff's request for a declaration that it is entitled to possession of the lease property because of the untimely renewal is **DENIED**. The parties must proceed to trial on the question of whether Defendant is entitled to equitable intervention to prevent a forfeiture of Defendant's interest in the lease.

**IT IS ORDERED.**

                                                s/Victoria A. Roberts
                                                Victoria A. Roberts
                                                United States District Judge

Dated: September 5, 2007

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on September 5, 2007.

s/Linda Vertriest
Deputy Clerk